## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DAVID KAISER,**
**D.O.C. # 102094,**

      **Plaintiff,**

**vs.**                                       **Case No. 4:23-cv-225-WS-MAF**

**RICKY DIXON, et al.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff,[1] an inmate at the Florida Department of Corrections (FDOC), initiated this action by filing a pro se civil rights complaint under 42 U.S.C § 1983, alleging Defendants violated her Eighth and Fourteenth Amendment rights for failing to diagnose and treat her gender dysphoria. ECF No. 1. She is proceeding on her third amended complaint. ECF No. 46.

Defendants Dixon, Martinez, Kline, Harrell, McLaughlin, and Cardinez ("FDC Defendants") filed a motion to dismiss. ECF No. 54. Plaintiff filed a response. ECF No. 60. FDC Defendants filed a reply. ECF No. 65. Plaintiff filed a sur reply. ECF No. 71. A seventh Defendant, Dr. Joshi, was dismissed from the case with prejudice after a joint stipulation of voluntary dismissal

---

[1] Plaintiff identifies as a female; thus, female pronouns are used throughout.

was filed and accepted. ECF Nos. 72-73. Because of that, any claims relating

to Dr. Joshi will not be discussed. FDC Defendants' motion is ripe for review.[2]

## I.    Allegations of the Third Amended Complaint, ECF No. 46[3]

Plaintiff is a transgender inmate at the Florida Department of

Corrections ("FDOC"). Though biologically male, she identifies as a female.

FDOC has a three-step process in place to diagnose and treat inmates with

gender dysphoria ("GD"), codified in FDOC procedure 403.012.[4] Plaintiff

believes she has GD and availed herself of the process. During the first step,

she was "diagnosed" with GD at Liberty Correctional in August 2022.[5]

Pursuant to policy, she was then transferred to Wakulla Correctional for a

more intensive evaluation and assessment. In Plaintiff's case, this was

performed in January 2023 by Dr. Joshi, a psychologist who contracts with

FDOC through Centurion. After the 90-day assessment, the completed

---

[2] The instant case mirrors another pending before this Court. See DeMontalvo v. Dixon, Case No. 4:23-cv-475-MW-MAF (N.D. Fla.) (report recommending dismissal filed October 17, 2024). Because the facts, issues, and arguments of the parties are extremely similar in both cases, so too are the Court's recommendations.

[3] This account of the facts comes from the third amended complaint ("complaint"). See ECF No. 46 at 7-15 (claims pertaining to FDC Defendants). The Court accepts the complaint's non-conclusory factual allegations as true at the motion to dismiss stage. See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992), cert. denied, 113 S. Ct. 1586 (1993). Any new or additional facts included in Plaintiff's response or sur reply, of which there are several, "cannot substitute for missing allegations in the complaint." Dorman v. Aronofsky, 36 F.4th 1306, 1317 (11th Cir. 2022).

[4] Plaintiff cites this procedure number and "incorporate[s] [it] by reference." ECF No. 46 at 7. FDC Defendants provide a copy in full as "Exhibit A" of their motion. ECF No. 54-1.

[5] Plaintiff's use of the term "diagnosed" is conclusory, discussed infra.

evaluation and recommendations are reviewed by the Gender Dysphoria Review Team ("GDRT")[6] who enter a final disposition. After the assessment and review, Plaintiff was denied entry into the GD program.

While not clearly stated, it is evident from the complaint that Dr. Joshi found Plaintiff did not meet the GD diagnosis criteria and the GDRT accepted her findings. This is because Plaintiff alleges that the second step of the process "should be determining the severity of the GD" and not determining "a second diagnosis." ECF No. 46 at 8, 11. She alleges that in practice, step two "has become an opportunity to do a second unwritten, undocumented diagnosis where a heightened standard is applied that no inmate can pass unless the individual psychologist chooses to let them pass."[7] Id. at 8. Further, she alleges FDC Defendants "are engaged in an active conspiracy" with "most if not all of the" FDOC psychologists…to deny inmates [entry] into the GD program by holding them to a heightened standard" in order to limit the number of people in the program. Id. at 15, 8. She claims FDC Defendants were deliberately indifferent to her serious medical needs and have conspired with the psychologists to violate her Eighth and Fourteenth

---

[6] The GDRT is comprised of the FDC Defendants minus Secretary Dixon.
[7] Plaintiff alleges the "heightened standard" she faced did not apply to inmates assessed in 2018-2019, so she was treated differently than them. This is the basis of her equal protection claim. ECF No. 46 at 14. The effective date of FDOC's GD policy at issue was November 13, 2019. ECF No. 54-1 at 1.

Amendment rights. Her Fourteenth Amendment claim is via the Equal Protection clause.

Plaintiff sues each FDC Defendant in their individual and official capacity. She seeks nominal damages, punitive damages, injunctive relief, and cost of litigation (filing fee).

## II.    FDC Defendants' Motion to Dismiss, ECF No. 54

As a threshold matter, Plaintiff concedes several of FDC Defendants' arguments in her response. ECF No. 60. She "abandons" the official capacity claims (agreeing FDC Defendants are entitled to Eleventh Amendment immunity), request for injunctive relief, and request for punitive damages. Id. at 1, 12. Those claims should be dismissed.

This leaves the Eighth Amendment, Equal Protection, and conspiracy claims seeking nominal damages and cost of litigation against FDC Defendants in their individual capacity. As to these claims, FDC Defendants argue dismissal is warranted because Plaintiff fails to state a claim upon which relief can be granted. See ECF Nos. 54, 65. FDC They also assert qualified immunity. ECF No. 54 at 26-28.

## III.    Standard of Review – Motion to Dismiss

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff

must allege enough facts in the complaint that show entitlement to relief is plausible. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Asking for plausible grounds…does not impose a probability requirement at the pleading stage." Id. at 556. Instead, a claim is plausible when the court can draw "a reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); See also Wilborn v. Jones, 761 F. App'x 908, 910 (11th Cir. 2019).

At this stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006) (internal marks omitted.) Courts must disregard any conclusory allegations or legal conclusions masquerading as fact, assume the remaining facts are true—however doubtful—and determine if those facts are sufficient to proceed. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

The pleading standard is flexible, and pro se complaints are held to less stringent standards than those drafted by an attorney. Wright v. Newsome, 795 F.2d 964, 967 (11th Cir. 1986). That said, "a complaint must still contain either direct or inferential allegations respecting all material elements of a cause of action." Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir. 2006). This is to prevent a "largely groundless claim" from

proceeding through discovery. <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005).

"To state a cause of action under § 1983, a plaintiff must allege that (1) there was an act or omission that deprived [plaintiff] of a constitutional right, privilege, or immunity and (2) the act or omission was committed by a person acting under color of state law." <u>Evans v. St. Lucie Cnty. Jail</u>, 448 Fed. App'x 971, 973 (11th Cir. 2011) (citing <u>Hale v. Tallapoosa Cnty.</u>, 50 F.3d 1579, 1582 (11th Cir.1995). There is no dispute that FDC Defendants were acting under color of state law. The question then turns to whether there was an act or omission that violated Plaintiff's constitutional rights.

## IV.    Discussion

## A.    FDOC's Gender Dysphoria Policy[8]

At the heart of Plaintiff's claims is a disagreement and dissatisfaction with portions of FDOC's GD policy and Dr. Joshi's (lack of a) diagnosis. Plaintiff does not challenge the policy as written, but rather how she views it is being implemented based on her interpretation of its language and how it "should be" implemented. <u>E.g.</u>, ECF No. 46 at 8. It is important to first view

---

[8] FDOC Procedure Number 403.012. <u>See</u> ECF No. 54-1 at 1-7.

the policy and three-step process as written.[9]

The policy is titled "Identification and Management of Inmates Diagnosed with Gender Dysphoria." ECF No. 54-1 at 1. Its purpose is "to provide guidelines for a medical appraisal, mental health screening, evaluation and treatment of inmates meeting criteria for a diagnosis of [GD]." Id. at 2. It defines several terms, including the GDRT,[10] GD, and transgender. The distinction between someone who is transgender and someone who has GD is an important one. Transgender is a "general term used for [a person] whose gender identity does not conform to the typical expectations associated with the gender they were assigned at birth."[11] Id. GD, however, is a mental health diagnosis that a transgender person may or may not have, because it "refers to discomfort or distress experienced by an individual" due to "a perceived discrepancy between [their] gender identity and [their] gender assigned at birth."[12] Id. The policy specifies that, "a transgender inmate **may**

---

[9] Plaintiff classifies the steps differently than the policy does. She considers step one "the diagnosis," step two the "assessment" and step three "disposition" or "review." ECF No. 46 at 8, 11. Her labels are conclusory in light of the plain language of the policy.

[10] The GDRT is "composed of the Chief of Medical Services, Chief of Mental Health Services, Chief of Security Operations, Chief of Classification Management, and the Prison Rape Elimination Act (PREA) Coordinator." ECF No. 54-1 at 2.

[11] For example, "a male-to-female transgender [person] refers to a biological male who identifies as, or desires to be, a member of the female gender" and vice-versa. Id.

[12] Plaintiff lists a summary of the DSM-5 criteria for a GD diagnosis, which includes a showing of two or more of six listed symptoms for at least 6 months. ECF No. 46 at 12. But note the DSM-5 states "the condition is associated with **clinically significant** distress or impairment in social, occupational, or other important areas of functioning." *Criteria for*

**or may not qualify for a diagnosis of [GD]** depending on her/his level of distress or impairment."[13] Id. at 2-3 (emphasis added).

<u>Step One - Screening and Identification</u>

For inmates who believe they suffer from GD, step one of the process is "screening and identification." Id. at 3. It may result in a provisional diagnosis.[14] Id. at 3. The policy explicitly states "[a]ll **initial diagnoses of [GD] will be provisional** until a comprehensive assessment can be completed by a psychologist credentialed to diagnose and treat [GD] and the results are reviewed by the GDRT."[15] Id. (emphasis added). The provisional diagnosis is the responsibility of "mental health staff." Id. It "must be a consensus of the MDST[16] or, if not available, a clinician credentialed to diagnose and treat [GD]." Id. Step one takes place at the inmate's assigned institution. If they receive a provisional diagnosis, they are transferred to an institution that can accommodate step two. Id. at 4.

---

*Gender Dysphoria.* Association AP. Diagnostic and statistical manual of mental disorders (DSM-5®). American Psychiatric Pub. (emphasis added).

[13] This is consistent with the DSM-5 criteria discussed *supra* at n.12.

[14] While the policy does not define "provisional," the ordinary meaning is "serving for the time being; temporary." *Provisional.* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/provisional. (Accessed Oct. 7, 2024).

[15] Throughout, the policy uses distinguishing terminology like "known or potential [GD] inmates," as well as "provisional diagnosis" and "formal diagnosis." Id. at 3, 4, 7.

[16] The Multidisciplinary Services Team (MDST) "refers to staff representing different professions and disciplines, which has the responsibility for ensuring access to necessary assessment, treatment, continuity of care and services to inmates in accordance with their identified mental health needs." Id. at 2.

<u>Step Two – Assessment and Evaluation</u>

The second step is the "assessment" of GD which involves "completion of the *Psychological Evaluation for Gender Dysphoria*[17]… by the evaluating psychologist, who must be credentialed in the diagnosis and treatment of [GD]." <u>Id.</u> At the first appointment, the psychologist explains "potential treatment and permissible accommodations" as well as "the potential consequences of a [GD] diagnosis" and obtains a mental health evaluation or treatment consent form from the inmate. <u>Id.</u> The evaluation takes place within the next 90 days.[18] <u>Id.</u> Then, the completed psychological evaluation form is sent to the GDRT for "review and final disposition."[19] <u>Id.</u>

<u>Step Three - Treatment</u>

If an inmate is formally diagnosed with GD, they are treated according to their treatment plan at a designated GD institution. <u>Id.</u> at 4, 7. To receive treatment, "inmates must remain at a mental health designation of S-2 or

---

[17] FDOC Form DC4-643E.

[18] Plaintiff alleges the assessment includes "weekly appointments with a counselor…a psychological personality inventory test…an IQ test," and the DC4-643E form. ECF No. 46 at 7.

[19] Part of GDRT's role is to "review recommendations for the treatment and management of inmates diagnosed with [GD] to ensure individualization in the decision-making process." <u>Id.</u> at 3. Plaintiff argues that GDRT cannot "review a diagnosis of GD [and] approve or disapprove." ECF No. 46 at 11. But as program administrators, they have inherent authority to accept or deny inmates entry into the GD program based on and consistent with the inmate's formal diagnosis. This is not a case where Plaintiff was formally diagnosed with GD yet denied necessary treatment or entry into the program.

higher."[20] Id. at 5. Treatments range from individual and group therapy to hormone therapy. Id. Some of the accommodations provided to those with a formal diagnosis are alternative canteen items, opposite gender uniforms, and female hair standards. Id. at 6.

While not addressing the policy in great detail, the Eleventh Circuit has commented that it "properly attends to inmates' individualized medical needs." Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1267 (11th Cir. 2020); see also Barnhill v. Inch, No. 4:18-CV-564-MW/MAF, 2020 WL 6049559, at *6 (N.D. Fla. Aug. 28, 2020), report and recommendation adopted, No. 4:18CV564-MW/MAF, 2020 WL 6048744 (N.D. Fla. Oct. 13, 2020) (same). However, in both cases the dispute was over treatment, not diagnosis.

## B. Eighth Amendment Considerations

Plaintiff believes she has gender dysphoria. Though provisionally diagnosed with GD by unidentified DOC staff[21] during the step one screening

---

[20] FDOC uses the following classifications for the mental health status of inmates: S-1 (no significant mental or emotional impairment); S-2 (mild to moderate mental or emotional impairment); S-3 (mild to moderate mental and/or behavioral instability). "Necessary care" is provided at levels 2 and 3. See Fla. Admin. Code R. 33-601.800(3)(e), "Close Management Referral Assessment, Form DC6-128." This type of treatment consideration was affirmed by the Eleventh Circuit with regard to inmates suffering from varying degrees of Hepatitis C. See Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1273 (11th Cir. 2020).

[21] Plaintiff does not say who performed the provisional diagnosis or what was involved, only stating it was done by "a clinician credentialed to diagnose and treat [GD]." ECF No.

phase, after a three-month assessment Dr. Joshi concluded Plaintiff did not meet the criteria for a GD diagnosis. As a result, the GDRT denied Plaintiff entry into the GD program.

Plaintiff claims her issues are only with the assessment and review stage. ECF No. 46 at 7 ("the second and third [steps of 403.012] are the subject of this action").[22] That necessarily means she is not challenging the stated policy in step one that all "initial diagnoses of [GD] will be provisional until a comprehensive assessment can be completed by a psychologist credentialed to diagnose and treat [GD] and the results are reviewed by [GDRT]." ECF No. 54-1 at 3. Still, she argues that the initial diagnosis constitutes a diagnosis under the "national standards," so FDC Defendants knew she had GD but "intentionally ignored" it and failed to treat her. ECF No. 46 at 13; see also ECF No. 60 at 9-10.

A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). This also applies to prison doctors. Id. It is well-established that a "difference in medical opinion between the prison's medical staff and the

---

46 at 7. This simply echoes the policy requirements as to who can conduct the initial screening. See ECF No. 54-1 at 4.

[22] Though she classifies the assessment/evaluation and review as steps two and three, both are encompassed in step two of the policy.

inmate as to…diagnosis or course of treatment"—or even claims of medical malpractice—are insufficient to show a constitutional violation. Keohane v. Fla. Dep't of Corr., Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020), *citing* Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991); see also Estelle, 429 U.S. at 106. Instead, a plaintiff must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106.

"A prisoner bringing a deliberate-indifference claim has a steep hill to climb." Keohane, 952 F.3d at 1266. This is because "the Constitution doesn't require that the medical care provided to prisoners be perfect, the best obtainable, or even very good." Id., *citing* Harris, 941 F.2d at 1510 (internal quotations omitted). "Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris, 941 F.2d at 1505 (internal marks omitted).

Accordingly, a plaintiff must allege facts that plausibly show: (1) he/she has (or had) a serious medical need; (2) the defendant was deliberately indifferent to that need; and (3) a causal connection between the defendant's conduct and the Eighth Amendment violation. Mann v. Taser Int'l, Inc., 588 F.3d at 1306 (11th Cir. 2009).

The first prong is a showing of a serious medical need, which is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and "if left unattended, poses a substantial risk of serious harm." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal marks and citations omitted).

The second prong is a showing of deliberate indifference. A plaintiff must allege facts which demonstrate the prison official (1) knew of the substantial risk to the plaintiff's health and (2) disregarded that risk by conduct that was subjectively reckless. See Wade v. McDade, 106 F.4th 1251, 1262 (11th Cir. 2024). "Subjective recklessness" requires a showing that the "defendant was actually…aware that his [or her] own conduct caused a substantial risk of serious harm to the plaintiff." Id.  Finally, "even if the defendant actually knew of a substantial risk to inmate health or safety, he [or she] cannot be found liable under the [Eighth Amendment] if he [or she] responded reasonably to the risk." Id. (citing Farmer, 511 U.S. at 844-855).

The standard may be met in instances where a prisoner is subjected to repeated examples of delayed, denied, or grossly incompetent or inadequate medical care; when prison personnel fail to respond to a known medical problem; or if prison doctors take the easier and less efficacious

route in treating an inmate. <u>See</u> <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989) (but highlighting that neither medical malpractice nor a difference in medical opinion or course of treatment constitute deliberate indifference). "However, not every claim by a prisoner that he [or she] has not received adequate medical treatment states a violation of the Eighth Amendment." <u>McElligott v. Foley</u>, 182 F. 3d 1248, 1254 (11th Cir. 1999).

Here, Plaintiff has failed to state a plausible Eighth Amendment claim. While it is true that GD can be a serious medical need, the facts alleged by Plaintiff do not confirm that she is suffering from it, let alone that it is severe enough to mandate treatment or, if left untreated, would pose a substantial risk of serious harm. At best, her complaint alleges a disagreement with Dr. Joshi's diagnosis. As discussed above, this type of diagnosis-dispute argument is insufficient to state a constitutional claim.[23]

Even assuming Plaintiff's provisional diagnosis could be construed as a serious medical need—something not present with the facts alleged—she has not described anything close to deliberate indifference.[24]    FDC

---

[23] <u>See</u> *supra* at 11-12.

[24] This is not to say a plaintiff could never state a cognizable claim with only a provisional diagnosis, nor would this dismissal prevent Plaintiff from filing a claim in the future should the facts change or her symptoms worsen and FDOC officials fail to reasonably respond. Further, nothing in the policy suggests that an inmate cannot reinitiate the process if his or her needs change due to increasing levels of distress over a 6-month period (i.e. DSM-5 criteria).

Defendants took reasonable action when Plaintiff brought her potential GD to their attention. She was afforded a provisional evaluation with mental health staff, then transferred to a more specialized facility where a three-month evaluation occurred with staff including Defendant Joshi, a psychologist credentialed to diagnose GD. Plaintiff's allegations fail to show the Defendants knew there was a substantial risk to her health because after that formal evaluation, Dr. Joshi disagreed with the provisional diagnosis and found Plaintiff did not meet the GD diagnosis criteria.[25] FDC Defendants, relying on that opinion, denied Plaintiff entry into the GD program. This is not a case where Plaintiff alleges additional facts or symptoms that could show she has a condition that "if left unattended, poses a substantial risk of serious harm."[26] Brown, 387 F.3d at 1351. Thus, FDC Defendant's reliance on Dr. Joshi's evaluation was also a reasonable response.

Because Plaintiff has failed to state a claim showing a serious medical

---

[25] Plaintiff believes this shows a conspiracy to limit participants in the program. E.g., ECF No. 46 at 8, 13. But the same series of events is commonplace to anyone who has been through the process of diagnostic testing, where one medical professional believes symptoms indicate a certain condition that warrants further study with a specialist, who then investigates and may rule out or disagree with the initial opinion. This is especially true in the field of mental health, where symptoms are often on a spectrum and not as clear cut as, say, a broken bone.

[26] While Plaintiff alleges she entered FDOC with a pre-existing diagnosis of "Gender Identity Disorder" (a prior iteration of GD), she does not claim she entered with a treatment plan that FDOC unreasonably refused to continue. ECF No. 46 at 7. In fact, in her response she states "GD is not a mental illness, it is a naturally occurring part of human gender diversity, yet I need a diagnosis? GD does not require treatment in the traditional sense." ECF No. 60 at 12.

need and deliberate indifference, her Eighth Amendment claims against all FDC Defendants should be dismissed.

## C.    Equal Protection Claim

To establish a claim under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that "(1) [he or she] is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against [him or her] based on race, religion, national origin, or some other constitutionally protected basis." Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311, 1319 (11th Cir. 2006) (internal citations omitted).  Put simply, the clause is "essentially a direction that all persons similarly situated should be treated alike" by governmental actors. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

Here, Plaintiff claims that she was "similarly situated to every person in the GD program when they were being evaluated…and is entitled to have the same standards applied to her diagnosis, evaluation, and disposition as was applied to theirs." ECF No. 46 at 14. The problem with Plaintiff's argument is that she did have the same policy applied to her as anyone else in steps one and two of the process.[27] Once she got to step three, she was

---

[27] At least as it relates to those in the program after the current policy was implemented in November 2019. To the extent Plaintiff compares herself to "participants who were

not similarly situated to those with a formal GD diagnosis because she did not have one. Plaintiff makes a conclusory allegation that she was held to a "heightened" standard, without explaining how the requirements were anything other than FDC Defendants complying with their policy.[28] Denying people who do not qualify for a formal GD diagnosis entry into a program designed for those with GD does not amount to a violation of Plaintiff's equal protection rights.[29]

## D. Remaining Claims

Plaintiff's remaining claims are conspiracy against FDC Defendants and supervisory liability against Defendant Dixon. Additionally, FDC Defendants raise the defense of qualified immunity in their motion to dismiss. The throughline requirement in each of these areas is the presence of a constitutional violation. See e.g., Grider v. City of Auburn, Ala., 618 F.3d 1240, 1260 (11th Cir. 2010) (conspiracy claim involves an agreement to violate a plaintiff's constitutional rights); Mann v. Taser Int'l, Inc., 588 F.3d at

---

evaluated in 2018-2019," ECF No. 46 at 14, she cannot be similarly situated to them, because the current policy did not exist.

[28] Though Plaintiff claims "no inmate can pass" this "heightened standard," she follows by saying there is a "less than 10%" approval rate in 2022-2023. ECF No. 46 at 8, 9.

[29] See E & T Realty v. Strickland, 830 F.2d 1107, 1112 (11th Cir. 1987) (no violation of equal protection rights when the government grants "a permit to an applicant who has a nonfrivolous claim of entitlement under the pertinent legislation and [denies] a permit to another applicant who is clearly unentitled to it: the two…are not similarly situated").

1305-1308 (11th Cir. 2009) (stating "the central tenet" of supervisory liability "is a constitutional or statutory violation"); Smith ex rel. Smith v. Siegelman, 322 F.3d 1290, 1298 (11th Cir. 2003) (finding defendants were entitled to qualified immunity where the plaintiff "failed to sufficiently allege a constitutional violation," without "need[ing] to proceed to the next step of determining if a constitutional right was clearly established").

Because Plaintiff has failed to state a claim concerning a constitutional violation by any of the FDC Defendants, her remaining claims necessarily fail and FDC Defendants are entitled to qualified immunity.

## V.    Recommendation

For the reasons discussed, it is respectfully **RECOMMENDED** that FDC Defendants' motion to dismiss, ECF No. 54, be **GRANTED**, and the action **DISMISSED** for failure to state a claim on which relief may be granted. The dismissal should be with prejudice because any amendment would be futile given the admitted facts. The dismissal should also count as a "strike" pursuant to 28 U.S.C § 1915(e)(2)(B)(ii).

**IN CHAMBERS** at Tallahassee, Florida on October 24, 2024.

> s/ Martin A. Fitzpatrick
> **MARTIN A. FITZPATRICK**
> **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).